UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

DAVID KNOTT and UNITED ASSET
RECOVERY, INC.

        Plaintiffs,

v.

MICHAEL W. FRERICHS, in his official
capacity as Illinois State Treasurer,

        Defendant.

Case No. 3:24-cv-03067-CRL-DJQ

## PLAINTIFFS' FIRST AMENDED COMPLAINT

## INTRODUCTION

1. This civil-rights lawsuit seeks to vindicate the First and Fourteenth Amendment rights of Plaintiffs David Knott and his company United Asset Recovery, Inc., to read, analyze, and compile documents, communicate information, provide advice, and petition the government, all in pursuit of helping his willing customers recover their unclaimed property from the government.

2. "Unclaimed property" is property, such as uncashed checks and abandoned accounts, that has been forgotten or misplaced by its owner and surrendered by the bank or other property holder to the state to keep in trust until the owner claims it. Illinois State Treasurer Michael W. Frerichs ("Treasurer") holds over five billion dollars in unclaimed property. Unclaimed Property, Illinois State Treasurer, https://icash.illinoistreasurer.gov. The Treasurer is required by law to "pay or deliver property" to its owner when he "receives evidence sufficient to establish" ownership. 765

ILCS 1026/15-904. Yet property owners are often unaware they have unclaimed property waiting for them and find it challenging to locate their property, let alone recover it.

3. Unclaimed asset finders like David and his company are trying to help. For nearly two decades David has labored to find people's assets held in government trusts and facilitate their return. Once he finds a property, he contacts the owner and tells them that they could reclaim their money. He offers his advice and his help in doing that. Clients greatly appreciate his services, and frequently ask David to let them know if he finds more of their assets.

4. But in 2021, Illinois halted David in his tracks, ordering him to obtain a state license to continue helping his clients. First, it ordered David to obtain a private detective license—even though David's work has nothing to do with being a private detective. Then, after David sued, it changed its mind: As of January 2026, David needs a novel "finder" license instead.

5. The state's 2026 shift is more than a change in nomenclature. Obtaining either license—old or new—would impose significant burdens on David, and David doesn't believe he should have to get a state license to exercise his First Amendment rights regardless. But the new law goes further: When the state created the new "finder" license, it conditioned licensure on past compliance with the old private detective requirement—the same requirement that David may have violated in 2021. So even if David *were* willing to spend time and money applying for a state "finder" license, the state could still deny him because he didn't have a private detective license in 2021. Continuing to help clients without a license would open David up to hefty fines and civil penalties.

6. The license requirement makes it harder for David and others like him to help people recover their unclaimed property from the state. But Illinois has a clear

incentive to impose irrational and unnecessary barriers like the license requirement: The fewer people recover their property, the more money the state has to shore up its budget. For example, the state can divert unclaimed property to the State Pensions Fund. *See* 765 ILCS 1026/15-801. The harder it is to recover property, the more the state profits.

7.    Illinois's license requirement (old and new alike) is unconstitutional. David's work helping his clients find and recover unclaimed property is entirely covered by the First Amendment's speech and petition clauses. And, even if it weren't, the Fourteenth Amendment prohibits Illinois from banning David from his occupation unless he obtains a burdensome and unnecessary license.

8.    David has been unable to help his clients find and recover their property in Illinois since 2021, when he received a letter from the Treasurer accusing him of breaking the law by offering information and advice to clients without a state license. To secure the constitutional rights of David and his company, the Court should declare that Illinois's licensing law is unconstitutional both facially and as applied and enjoin Defendant from enforcing it against David and his company. *See generally Richwine v. Matuszak*, 148 F.4th 942 (7th Cir. 2025).

**JURISDICTION AND VENUE**

9.    This is a civil-rights action brought under the First and Fourteenth Amendments to the U.S. Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

10.    Plaintiffs seek declaratory and injunctive relief against Defendant's enforcement of 765 ILCS 1026/15-1302(e), 765 ILCS 1026/15-1303, and 74 Ill. Admin. Code 760.651(a)(1) against Plaintiffs. Together, these provisions are referred to as the "license requirement" or the "licensing law."

11.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

12.     Venue is proper under 28 U.S.C. § 1391(b).

### PARTIES

13.     Plaintiff David Knott is a U.S. citizen who lives in Oceanside, California. David is not licensed as an asset finder (or private detective) in Illinois (or in any state).

14.     Plaintiff United Asset Recovery, Inc. is a California corporation, incorporated in 2016, operated and wholly owned by David, with its principal place of business in Carlsbad, California. Prior to incorporation, United Asset Recovery operated as a DBA of David from 2005 through 2016.

15.     Defendant Michael W. Frerichs is the Illinois State Treasurer, and thus the state's Chief Investment and Banking Officer. Defendant Frerichs first took office in 2015 and is tasked with holding unclaimed property in Illinois in trust until it can be returned to its owner and administering efforts to return the same. 765 ILCS 1026/15-102(1) (State Treasurer is administrator of unclaimed property). *See generally* 765 ILCS 1026 (establishing administrator's responsibilities concerning unclaimed property). The Treasurer is responsible for administering and enforcing Illinois's finder licensing scheme. 765 ILCS 1026/15-1302(h), 1303; Ill. Admin. Code 760.940(e). Defendant Frerichs is referred to here as the "Treasurer" and is sued in his official capacity.

### STATEMENT OF FACTS

### *David Recovers People's Property*

16.     David Knott is an entrepreneur who lives in Oceanside, California, about 38 miles north of San Diego.

17.     In the mid-2000s, David learned about state governments' holdings of unclaimed property—financial assets that have been forgotten, misplaced, or

unintentionally abandoned by their owners. Unclaimed property can take the form of uncashed checks, abandoned accounts, or other financial assets.

18. With individuals, property often becomes forgotten or misplaced when they move. Checks or account balances are sent to their old addresses without the owner's knowledge. Companies, meanwhile, routinely forget about or misplace property as part of doing business. In either case, the property becomes unclaimed.

19. In Illinois, holders of unclaimed property—such as banks with accounts that have been abandoned—are required to turn that property over to the state treasurer. 765 ILCS 1026/15-603.

20. The Treasurer is the "administrator" of unclaimed property turned over to the state and "holds [that] property as custodian for [the property's] owner." 765 ILCS 1026/15-102(1) (Treasurer is administrator); 765 ILCS 1026/15-804 (administrator is custodian). The Treasurer holds this property in trust and is "responsible for the safekeeping thereof" until the owner claims it. 765 ILCS 1026/15-804.

21. The Treasurer "must honor" a claim for property and "shall pay or deliver" it to the claimant "if the administrator receives evidence sufficient to establish to the satisfaction of the [Treasurer] that the claimant is the owner of the property." 765 ILCS 1026/15-904(a).

22. Much of this property is never claimed and, as a result, Illinois holds onto large amounts of unclaimed property. Right now the Treasurer holds more than five billion dollars in unclaimed property. Unclaimed Property, Illinois State Treasurer, https://icash.illinoistreasurer.gov.

23. Illinois and its officials have a financial incentive to make it harder to reclaim property. Though Illinois holds over five billion dollars in unclaimed property,

state law requires the Treasurer to divert all but $2.5 million into the State Pensions Fund biannually unless he determines that $2.5 million will be insufficient to pay out claims. 765 ILCS 1026/15-801(a). So long as no more than $2.5 million is likely to be reclaimed, the state can continue to grow its pension fund with owners' unclaimed property.

24. Property owners are often unaware of the existence and location of their property and lack the time, knowledge, or resources to recover their property once they find it.

25. To address this issue, unclaimed asset finders take it upon themselves to search through public databases of unclaimed property, then contact the property owners to let them know about their money and help them get it back.

26. Asset finders provide their services in exchange for an industry-standard contingent commission based on the value of the asset. Generally, this commission is 10% of the asset's value. Most asset finders file claims for single high-value assets to maximize their profit per claim.

27. David discovered an opening in the market: many businesses have large numbers of low-value assets sitting unclaimed in state accounts across the country. Though assisting in the recovery of multiple low-value assets can require more work than doing the same for a single high-value asset, that extra work means there is less competition for a client's business.

28. So in 2005, David launched United Asset Recovery with a novel business model: comb through unclaimed property databases nationwide and approach businesses with an offer to help recover large volumes of their low-value assets on an ongoing basis.

29. David and his company also work on many single, "one-off" claims for individuals and businesses.

6

30.     David's clients greatly appreciate his work recovering low-value assets. Finding and reclaiming those assets without David's help would be prohibitively burdensome and time-consuming for David's clients. David's experience and expertise mean that he can find, assemble, and submit the necessary information efficiently, saving his clients time and money. Without David's help, many low-value assets would simply go unclaimed.

31.     David worked hard to build up a client base for his company, often working long hours and seven days a week searching through public records, offering clients advice, and communicating information to clients and state officials. David's strong work ethic has allowed his company to remain small—United Asset Recovery has never had more than four employees (including David) at any one time.

32.     And David's hard work paid off—over nearly two decades, United Asset Recovery has helped its clients recover property in many states, including Illinois.

### *Recovering Property in Illinois*

33.     Ownership or custody of unclaimed property can vest in the state in a process called "escheat." *See Cerajeski v. Zoeller*, 735 F.3d 577, 579 (7th Cir. 2013). Escheatment "was an outgrowth of the feudal tenure system of landholding whereby the king was recognized as the ultimate owner of all real property." *La. Health Serv. & Indem. Co. v. McNamara*, 561 So. 2d 712, 715 (La. 1990). This power has often proved controversial, producing the modern word "cheat." *See Cheat*, Merriam-Webster, https://www.merriam-webster.com/dictionary/cheat.

34.     The "most common modern form[s] of unclaimed property legislation . . . are 'custodial' escheat laws," where the state holds property "in perpetual custody for the missing owner." *La. Health Serv. & Indem. Co.*, 561 So. 2d at 716. Illinois's unclaimed

property law follows this model—the state takes possession of unclaimed property not as the owner, but to hold in trust.

35.    "[R]ealism requires recognition that unclaimed property statutes are also a means of raising state revenue" and have been for centuries. *Cerajeski*, 735 F.3d at 583 (cleaned up). *See* 1 William Blackstone, *Commentaries* *302 (recognizing escheat as a source of royal revenue).

36.    The potential to use unclaimed property for revenue has led states to take "pervers[e]" positions where they seek to retain or obtain ownership of all or part of the property held in trust. *See Cerajeski*, 735 F.3d at 583. Illinois's use of unclaimed property to fund the State Pensions Fund illustrates the dangerous incentives that arise when the state holds large sums of money that it does not own. *See* 765 ILCS 1026/15-801.

37.    When the state learns who the rightful owner is, it must return the property. *See* 765 ILCS 1026/15-904. But owners need to find the property first. The Illinois State Treasurer maintains a little-known but publicly accessible database of unclaimed property it holds at https://icash.illinoistreasurer.gov.

38.    David's work in Illinois has been straightforward. First, he and his company search the Treasurer's public database to find unclaimed property owned by past, current, or potential clients and identify the rightful owner. Next, David tracks down the rightful owner and tells them the good news—they have money they don't know about. Sometimes, this is a current client. Other times, it gives David a lead to a new client. Either way, if the owner wants David's help, David then offers to pull together the information and documents necessary to show ownership and send those to the Treasurer. Once the state returns the property to the owner, the owner (David's client) pays David and his company for their help.

39.     Illinois places tight restrictions on David's ability to help clients. For example, *all* finders (licensed or not) are banned from helping clients recover property for a fee until the Treasurer has already held the property for two years. 765 ILCS 1026/15-1302(a). Even after that period expires, finders can *never* charge more than 10% of the property reclaimed. 765 ILCS 1026/15-1302(c).

40.     The first step to recover unclaimed property in Illinois is to search the Treasurer's unclaimed property database and identify properties owned by a past, current, or potential client (and held for more than two years). Usually this isn't challenging—the database lists the name of the property owner, which is often identical to the legal name of the client or one of its subsidiaries.

41.     Sometimes, though, the database has old or partial names or addresses. David can search other public databases—such as records of mergers and acquisitions—to connect the dots and determine the current owner. For example, if the Treasurer's database lists a property owned by Company A but Company A was acquired by Company B, David could discover that through his research and then contact Company B to let them know the state is holding their money.

42.     If David and United Asset Recovery can't determine whom a property belongs to, they move on. Neither David nor his company help someone recover property unless they are confident that the claimant is the rightful owner of the property.

43.     The second step is to get the owner's permission for David and his company to help reclaim their money. When David identifies a new client, he and United Asset Recovery will generally look through databases for other properties belonging to the same owner and then contact the owner to tell them about their properties and provide advice

on how to recover them. If the owner wants David to help with that process, he and his company enter into an agreement with the owner.

44.     Often David and his company will find properties owned by existing clients. For many of those clients, David and his company will have agreements to provide their help with properties as they find them.

45.     The third step is to use the tools provided in the Treasurer's unclaimed property database to assemble a "claim." The claim tool is publicly accessible and anyone—including David's clients—could use the tool to submit a claim. But David's clients often prefer that David and his company handle this because of David's expertise in finding, compiling, and communicating the information the Treasurer requires to the state.

46.     When a client wants David and his company to handle this step, David or one of United Asset Recovery's other employees accomplishes this by adding each asset that they have determined is owned by the client. Each asset has a "claim" button provided for this purpose. In other words, United Asset Recovery uses the Treasurer's database to put together a list of properties its client is eligible to recover.

47.     Once United Asset Recovery has added all of the client's assets into the claim, the fourth step is for David or his employee to tell the system to generate a claim form. This form lists the properties United Asset Recovery identified as belonging to the company's client. The client, not David or United Asset Recovery, is the claimant. The Treasurer then sends this form to either United Asset Recovery or its client, either automatically through the system or manually.

48.     Fifth, the client (or an authorized employee when the client is a company) must sign the form and send it to United Asset Recovery.

10

49.    Last, United Asset Recovery assembles the supporting documentation that the Treasurer requires to release assets to the property owner. The exact documents that the Treasurer needs before releasing the property to the owner vary, but for United Asset Recovery's clients it often includes the following:

a. Proof of the tax identification number of the company or individual claiming the property;

b. Proof of the claimant's current (and sometimes past) addresses;

c. Photo identification for the claimant or its authorized employee;

d. If the claimant is a company, a letter from the company authorizing one of its employees to sign the claim form and receive the property;

e. If the claimant is a company, proof of the authorized employee's title within the claimant company;

f. A letter demonstrating that the claimant has granted United Asset Recovery the legal authority to submit claims on its behalf;

g. The fee agreement between the claimant and United Asset Recovery; and

h. When the name or address of the claimant differs from the name or address on the property listing, documents establishing the claimant's ownership of the asset.

50.    The last category—documents establishing ownership of the specific asset—is broad. Often, this is simply documentary evidence of a claimant's change of address or a merger or acquisition that led a claimant company to acquire ownership of the asset. Other times, the Treasurer requires documents establishing the claimant's history with the address associated with the asset or establishing the relationship between the

claimant and the property holder (the person or entity who turned over the property to the state).

51.     United Asset Recovery acquires these required documents in one of three ways: (1) accessing publicly available documents, such as merger and acquisition filings; (2) communicating with the property holder who turned over the property to the state; and (3) communicating with the claimant to obtain documents from their records. Generally, David prefers to find what he needs through research into publicly available documents rather than bother his clients. And he often already has the documents on hand, either from previous claims or from the first step when he identified the owner of the property.

52.     United Asset Recovery packages these documents together and submits them to the Treasurer along with the signed claim form.

53.     United Asset Recovery submits these forms in the client's name, not in David's name or in the name of United Asset Recovery. The claim is made on behalf of the client to the Treasurer for the client's assets that the Treasurer holds in trust for the client.

54.     In bundling and submitting documents in the client's name, United Asset Recovery is performing a basic administrative service for the client.

55.     Once United Asset Recovery submits its information to the Treasurer, it is up to the Treasurer to determine whether that information establishes the claimant as the owner of the property. If the evidence that David's company provides to the Treasurer is "sufficient to establish" ownership to the satisfaction of the Treasurer, the Treasurer "must honor [the] claim for [the] property" and "pay or deliver [the] property to [the] claimant," David's client. 765 ILCS 1026/15-904.

56.    David's company then responds to any requests from the Treasurer asking for additional evidence, obtains that evidence from public sources or the client, and continues providing that evidence until the Treasurer determines that David's client is the property owner and returns the property (or denies the claim).

57.    If the claim is denied, the denial does not legally bind David's client, waive any of the client's rights, or affect the client's ability to recover the asset later. The client could submit an amended claim in the future to establish evidence of ownership. 765 ILCS 1026/15-904(c)(2). And the Treasurer is required to "consider an amended claim . . . as an initial claim," subject to the same standards for proving ownership of the property. *Id.* at 15-904(c)(3).

58.    When the Treasurer determines that the evidence it has received sufficiently establishes that David's client is the owner of the claimed property, the Treasurer then returns the property (or equivalent monetary value) directly to David's client.

59.    The Treasurer does not return property or its cash equivalent directly to David or his company. Nor does the Treasurer pay anything else to David or his company. Because neither David nor his company ever receive any property (or cash) from the Treasurer, neither David nor his company ever possess any property (or cash) to pass on to the client or from which to deduct a contingency fee.

60.    Only once David's client receives its property directly from the Treasurer does the client pay United Asset Recovery—usually with a contingent commission of 10% of the value of the assets recovered.

61.    Put together, David and his company's activities helping clients find and recover assets from the Treasurer consist of:

a.  Reading public documents (both on the Treasurer's database and elsewhere, such as SEC filings);

b.  Analyzing those public documents;

c.  Communicating with the client (and, at times, the company that turned the property over to the state);

d.  Providing advice to the client;

e.  Compiling information and documents;

f.  Communicating information to the Treasurer identifying United Asset Recovery's client as the owner of property held by the state; and

g.  Communicating any additional information that the Treasurer requests to satisfy the Treasurer that United Asset Recovery's client is the owner of the property.

### *Illinois Stops David from Helping His Clients*

62.  Helping clients find and recover assets from the Treasurer is a lot of work, but it made a difference for David's clients. In the years before 2021, David helped his clients recover more than $600,000 in unclaimed property from Illinois.

63.  But in 2021, the Treasurer put a stop to that. On August 5, 2021, the office of the Treasurer sent a letter to David and his company ordering them to stop helping clients recover their property unless David and his company obtained state licenses.

64.  At the time, Illinois banned finders like David from helping clients recover unclaimed property without a state-issued private detective license. 765 ILCS 1026/15-1302(e) (2021), *amended by* 765 ILCS 1026/15-1302(e) (eff. Jan. 1, 2026). After David filed this lawsuit challenging that requirement, Illinois changed its mind and—effective

January 2026—created a novel "finder" license issued and controlled by the Treasurer. 765 ILCS 1026/15-1302(e).

### First, Illinois Stopped David Because He Isn't a Private Detective

65. The Treasurer's August 2021 letter informed David that it had learned that United Asset Recovery had been retained by three clients "to perform asset recovery measures for them."

66. That's true. All three companies had been David's clients for over five years, and two had been clients for over ten years. None are incorporated in Illinois. When David discovered that Illinois was holding property belonging to his clients, he assembled the necessary information and documents and submitted them to the Treasurer so that his clients could get their money back. David and his company did this with the permission of their clients.

67. The Treasurer's letter didn't dispute that the money in question belonged to David's clients. Nor did it claim that David or his company provided inaccurate information, submitted poor work, or otherwise harmed their clients.

68. Instead, the Treasurer's letter was focused on the fact that David and his company did not hold Illinois private detective licenses. The Treasurer's letter stated that David and his company were violating Illinois law by helping clients recover unclaimed property without first obtaining a private detective license.

69. Specifically, the Treasurer's letter accused David and his company of violating an Illinois statute—765 ILCS 1026/15-1302 (2021)—and its implementing regulation—74 Ill. Admin. Code 760.650 (2021).

70. 765 ILCS 1026/15-1302(e) (2021) prohibited David and his company from collecting an agreed industry-standard contingent commission from his clients for

15

"discovering, on behalf of an apparent owner, presumptively abandoned property" without a private detective license. 765 ILCS 1026/15-1302(e) (2021).

71.     74 Ill. Admin. Code 760.650(c)(2) (2021) required any claim for property submitted to the Treasurer where a "finder is assisting an apparent owner" to include "a copy of the active private detective license issued by the Illinois Department of Financial and Professional Regulation to the [asset] finder" if the finder charged a contingent commission.

72.     David is not a licensed private detective in Illinois or any other state. Neither does United Asset Recovery hold a private detective license in Illinois or any other state.

73.     Because David and his company charge an industry-standard contingent commission but neither have an "active private detective license," no claim that they assist with could have been submitted to the Treasurer under 74 Ill. Admin. Code 760.650(c)(2) (2021).

74.     In other words, 765 ILCS 1026/15-1302(e) (2021) and 74 Ill. Admin. Code 760.650(c)(2) (2021) prevented David or his company from:

    a. Reading public documents when the content of those documents concerns a client's or potential client's unclaimed property;

    b. Analyzing public documents when the content of those documents concerns a client's or potential client's unclaimed property;

    c. Communicating with the client, potential client, or others when the content of those communications concerns a client's or potential client's unclaimed property;

    d. Providing advice to a client, potential client, or others when the content of that advice concerns a client or potential client's unclaimed property;

e. Compiling information and documents when the content of that information or those documents concerns a client's or potential client's unclaimed property;

f. Communicating with the Treasurer when the content of those communications identifies a client as the owner of property held by the state; or

g. Communicating with the Treasurer when the content of those communications concerns requests from the Treasurer for additional information identifying a client as the owner of property held by the state.

75. David is not a licensed private detective because the work he performs is materially different than that of a private detective.

76. Obtaining a private detective license would have required David to spend at least three years working as a detective or investigator (or in a "substantially equivalent" role) and pass an exam on topics irrelevant to his work finding and recovering unclaimed property. 225 ILCS 447/15-10(a)(6).

77. David does not meet this requirement because David's company is not a private detective agency, and David has not worked for a private detective agency, a licensed attorney, a corporation with 100 or more employees, the armed forces, or a law enforcement agency in the past five years.

78. In fact, the vast majority of states do not require asset finders like David and his company to obtain private detective licenses (or equivalent licenses) to help clients find and recover unclaimed property, regardless of the fee structure.

79. To meet the experience requirement, David would have had to leave his company for at least three years to work full-time as a detective or investigator doing work unrelated to helping clients find and recover unclaimed property.

80. To obtain a license, David would have had to "pass[] an examination authorized by" the Illinois Department of Financial and Professional Regulation. 225 ILCS 447/15-10(a)(8).

81. The private detective exam includes questions on topics such as "[e]valuating crime scenes," "[i]nterviewing and interrogation," "[s]urveillance techniques," and "[f]irearm regulations and requirements." *See* Private Detective and Private Security Contractor Licensure Examination Information, Continental Testing, https://www.continentaltesting.net/downloads/7-17%20DETSECGDE.pdf. The exam does not include questions on helping clients find and recover unclaimed property. *See id.*

82. David's work helping clients find and recover unclaimed property does not involve evaluating crime scenes, interviewing and interrogation, surveillance, or firearms. In fact, all of David's work can be performed from his company's office in Carlsbad, California (or the nearby post office) without ever stepping foot in Illinois.

83. To pass the exam, David would have had to spend time studying these and other topics that are irrelevant to his work helping clients find and recover unclaimed property, which David did not want to do.

84. The Treasurer's letter directed David and his company to contact the Private Detective Board, which enforces private detective laws and regulations in Illinois and administers the private detective exam.

85.    Under the Private Detective, Private Alarm, Private Security, Fingerprint Vendor, and Locksmith Act of 2004 ("Act"), practicing (or attempting to practice) private detective work without a license is a Class A misdemeanor, elevated to a Class 4 felony for "second or subsequent violation[s]." 225 ILCS 447/45-50(a). Each offense also incurs a civil penalty of up to $10,000. *Id.* at 45-50(c).

<u>Next, Illinois Stopped David By Creating a New License That Excludes David</u>

86.    On March 14, 2024, David and his company filed their original complaint.

87.    On March 31, 2025, the Court denied Defendants' motions to dismiss Plaintiffs' complaint.

88.    Next, Illinois changed the law—but it didn't get rid of the requirement to hold a state license to help clients with unclaimed property. Although it eliminated the private detective license requirement, it *also* created a new licensing scheme out of whole cloth that permanently bars David from helping clients recover property in the state. Illinois enacted this license in direct response to this lawsuit challenging the now-repealed requirement that David obtain a private detective license. This new license requirement specifically targets David.

89.    The state changed the law by amending the Illinois Revised Uniform Unclaimed Property Act and adopting new implementing regulations, both of which went into effect in January 2026. *See* 765 ILCS 1026/15-1302(e) (eff. Jan. 1, 2026); 765 ILCS 1026/15-1303 (eff. Jan. 1, 2026); 74 Ill. Admin. Code 760.001 *et seq.* (eff. Dec. 31, 2025) (together, the "license requirement").

90.    Now, "a person attempting or seeking to act as a finder must be licensed as a finder by the [Treasurer]," rather than a private detective. 765 ILCS 1026/15-1302(e). Otherwise, the finder's "agreement to locate property" for a client is "void." *Id.* at 15-

302(a). And "[n]o person shall, without a valid license issued by the administrator, represent or present to the public in any manner to be a finder in the State of Illinois or act as a finder." 74 Ill. Admin. Code 760.651(a)(1).

91.    In some circumstances, holders of *other* state licenses, such as CPAs and attorneys, may be exempt from the finder license requirement. 765 ILCS 1026/15-1302(f)–(g); 74 Ill. Admin. Code 760.651(a)(2)–(3).

92.    Illinois law defines a "finder" broadly, and the term includes any "person engaged in the location, recovery, purchase, or assignment of property held by the administrator for a fee, compensation, commission, or other remuneration paid by the owner of the property." 765 ILCS 1026/15-102(9.5). It also includes any "person engaged in *assisting* in the location, recovery, purchase, or assignment of property held by the administrator for a fee, compensation, commission, or other renumeration paid by the owner of the property." *Id.* (emphasis added).

93.    The license requirement prevents David or his company from:

   a. Reading public documents when the content of those documents concerns a client's or potential client's unclaimed property;

   b. Analyzing public documents when the content of those documents concerns a client's or potential client's unclaimed property;

   c. Communicating with the client, potential client, or others when the content of those communications concerns a client's or potential client's unclaimed property;

   d. Providing advice to a client, potential client, or others when the content of that advice concerns a client or potential client's unclaimed property;

20

e. Compiling information and documents when the content of that information or those documents concerns a client's or potential client's unclaimed property;

f. Communicating with the Treasurer when the content of those communications identifies a client as the owner of property held by the state; or

g. Communicating with the Treasurer when the content of those communications concerns requests from the Treasurer for additional information identifying a client as the owner of property held by the state.

94.    The license requirement prevents David or his company from reading, analyzing, communicating, providing advice on, and compiling the above information even if the client—not David or his company—submits the claim to the Treasurer. 765 ILCS 1026/15-102(9.5) ("assisting" clients recovering property is acting as a finder). David and his company cannot even tell their current clients that Illinois is holding their properties without violating the license requirement.

95.    Even just applying for a finder license would require David and his company to pay hundreds of dollars in non-refundable fees. 765 ILCS 1026/15-1303(c)(1); 74 Ill. Admin. Code 760.651(c)(1).

96.    Applying for a finder license would also require David and his company to secure a $100,000 fidelity bond running to the benefit of the Treasurer. 765 ILCS 1026/15-1303(d); 74 Ill. Admin. Code 760.651(c)(7).

97.    Applying for a finder license would also require David and his company to submit to (and pay for) a background check. 765 ILCS 1026/15-1303(c)(3); 74 Ill. Admin. Code 760.651(c)(3).

98.    And applying for a finder license would require David and his company to comply with numerous burdensome obligations, both at the time of their application and for as long as they held a license, such as notifying the Treasurer of any change of address within 14 days. 765 ILCS 1026/15-1303(c)(2)–(5); 74 Ill. Admin. Code §§ 760.651(c)(2)-(8).

99.    If David or his company obtained a finder license, the license would expire every three years, requiring further applications and fees. 765 ILCS 1026/15-1303(e); 74 Ill. Admin. Code 760.651(d)–(e).

100.    Under the Treasurer's current licensing scheme, David and his company will be required to satisfy the license requirement to help clients and potential clients find and recover unclaimed property in Illinois even though Defendant lacks any evidence that the license requirement prevents property owners or anyone else from being harmed.

101.    The aforementioned burdens are individually and collectively unconstitutional violations of Plaintiffs' speech and petition rights.

102.    But even if Plaintiffs were willing to submit to this unconstitutional scheme, which they are not, it is likely that Plaintiffs could not obtain the new finder license even if they wanted to. That's because eligibility for the finder license is tied to past compliance with the old private detective license requirement.

103.    The Treasurer may issue a license to David only after determining that he possesses "good moral character." 765 ILCS 1026/15-1303(b)(2); 74 Ill. Admin. Code 760.651(b)(2).

104.    To determine whether David or his company have "good moral character," the Treasurer "shall take into consideration . . . [w]hether the applicant has intentionally

22

violated any provision of this Act or a predecessor law or any regulations relating thereto." 765 ILCS 1026/15-1303(b)(2)(C); 74 Ill. Admin. Code 760.651(b)(2)(C).

105.    The Treasurer's 2021 letter informed David and his company that they were violating 765 ILCS 1026/15-1302 (2021) and 74 Ill. Admin. Code 760.650 (2021) (the private detective license requirement), which are each either the "Act or a predecessor law or [] regulations relating thereto." 1026/15-1303(b)(2)(C); 74 Ill. Admin. Code 760.651(b)(2)(C).

106.    Based on the Treasurer's 2021 letter, the Treasurer will likely conclude that David's assistance to his clients in 2021 violated the private detective law and thus refuse to issue David or his company a finder license on the grounds they believe that David or United Asset Recovery lack good moral character. This disqualifying provision of the new license, as described in paragraphs 103–104, was inserted for the specific purpose of stopping David from working in Illinois at all.

107.    Plaintiffs are thus likely ineligible to obtain finder licenses and permanently banned from helping clients with unclaimed property in Illinois.

Illinois's Past and Present License Requirements Ban David Without Reason

108.    Defendant has no evidence that fewer property owners or other people have been harmed by asset finders under the (past or present) license requirement than would have been harmed without such a requirement.

109.    Defendant has no evidence that fewer property owners or other people have been harmed by asset finders under the (past or present) license requirement than were harmed prior to the enactment of the license requirement.

110.    Defendant has no evidence that fewer property owners or other people were harmed by asset finders in Illinois than are harmed in other states that do not require asset finders to have a private detective license, finder license, or equivalent license.

111.    Any possible harms that unlicensed asset finders could cause could be addressed by laws less restrictive of First Amendment rights, such as other Illinois laws and regulations governing asset finders or targeted anti-fraud laws.

112.    On information and belief, before the Treasurer sent David the August 2021 letter it returned the assets David was seeking to only one of David's three clients. As of January 2026, the Treasurer still holds the assets David was attempting to help his other two clients recover.

113.    Since receiving the Treasurer's letter in 2021, David has helped no clients find unclaimed property in Illinois.

**INJURY TO PLAINTIFFS**

114.    Plaintiffs want to continue helping clients find and recover their unclaimed property in Illinois but cannot do so without risking government enforcement actions.

115.    Plaintiffs cannot help clients find and recover unclaimed property in Illinois without violating 765 ILCS 1026/15-1302(e), 765 ILCS 1026/15-1303, and 74 Ill. Admin. Code 760.651(a)(1) (together, the "license requirement").

116.    Enforcement of 765 ILCS 1026/15-1302(e) would invalidate contracts that David and his company enter into to help clients find and recover unclaimed property in exchange for a fee because neither David nor his company are "licensed as a finder by the [Treasurer]." *See* 765 ILCS 1026/15-1302(e). David and his company cannot perform work helping their clients find and recover unclaimed property if their contracts with clients are void.

24

117. Enforcement of the license requirement would result in the Treasurer denying any claims David or his company submitted on behalf of clients because neither David nor his company have a finder license. 765 ILCS 1026/15-1302(e) (must be "licensed as a finder" to "act as a finder"), 765 ILCS 1026/15-1303 (must have a "valid license issued by the [Treasurer]" to "act as a finder"), and 74 Ill. Admin. Code 760.651(a)(1) ("must be licensed as a finder by the [Treasurer]" to "act as a finder"). David and his company cannot perform work helping clients find and recover unclaimed property if the Treasurer will deny any claims they submit.

118. Enforcement of the license requirement would result in the Treasurer denying any claims submitted by David and his company's clients if David or his company "assist[ed]" because neither David nor his company have a finder license. 765 ILCS 1026/15-102(9.5) (acting as a "[f]inder" includes "assisting" in the reclamation of property); 765 ILCS 1026/15-1302(e) (must be "licensed as a finder" to "act as a finder"); 765 ILCS 1026/15-1303 (must have a "valid license issued by the [Treasurer]" to "act as a finder"); and 74 Ill. Admin. Code 760.651(a)(1) ("must be licensed as a finder by the [Treasurer]" to "act as a finder"). David and his company cannot perform work helping clients find and recover unclaimed property if the Treasurer will deny any claims they assist clients with.

119. The threat of enforcement of the license requirement has thus prevented Plaintiffs from doing the following:

    a. Reading public documents when the content of those documents concerns a client's or potential client's unclaimed property;

    b. Analyzing public documents when the content of those documents concerns a client's or potential client's unclaimed property;

25

    c.  Communicating with the client, potential client, or others when the content of those communications concerns a client's or potential client's unclaimed property;

    d.  Providing advice to a client, potential client, or others when the content of that advice concerns a client or potential client's unclaimed property;

    e.  Compiling information and documents when the content of that information or those documents concerns a client's or potential client's unclaimed property;

    f.  Communicating with the Treasurer when the content of those communications identifies a client as the owner of property held by the state; or

    g.  Communicating with the Treasurer when the content of those communications concerns requests from the Treasurer for additional information identifying a client as the owner of property held by the state.

120. If Plaintiffs were to help clients or potential clients find and recover unclaimed property in Illinois without finder licenses in violation of the new law, they would face hefty civil penalties for acting as finders without a license. 765 ILCS 1026/15-1303(i); 74 Ill. Admin. Code 760.940(e).

121. The threat of enforcement of the license requirement has prevented Plaintiffs from helping clients find and recover unclaimed property in Illinois, a major hub of business and industry.

122. The threat of enforcement of the license requirement has prevented Plaintiffs from offering to help new clients find and recover their unclaimed property, both in Illinois and nationwide. Many clients prefer to contract with asset finders who can

help find and recover their assets across many jurisdictions. Being prohibited from providing services in Illinois thus prevents Plaintiffs from landing new accounts, even to help find and recover assets outside of Illinois.

123. The threat of enforcement of Illinois's license requirement has prevented Plaintiffs from receiving commissions on the property they could help find and recover for new and existing clients.

124. The threat of enforcement of Illinois's license requirement has prevented Plaintiffs from assisting past, current, and potential clients recover their unclaimed property in Illinois.

125. The threat of enforcement of Illinois's license requirement has prevented Plaintiffs from working in the occupation of their choosing.

126. But for Defendant's enforcement of Illinois's license requirement, Plaintiffs would not fear future prosecution or other government actions.

127. But for Defendant's enforcement of the license requirement Plaintiffs would not decline to do the following and would immediately resume offering to do the same in Illinois:

    a. Read public documents when the content of those documents concerns a client's or potential client's unclaimed property;

    b. Analyze public documents when the content of those documents concerns a client's or potential client's unclaimed property;

    c. Communicate with the client, potential client, or others when the content of those communications concerns a client's unclaimed property;

    d. Provide advice to a client, potential client, or others when the content of that advice concerns a client or potential client's unclaimed property;

27

e.  Compile information and documents when the content of that information or those documents concerns a client's or potential client's unclaimed property.

f.  Communicate with the Treasurer when the content of those communications identifies a client as the owner of property held by the state; and

g.  Communicate with the Treasurer when the content of those communications concerns requests from the Treasurer for additional information identifying a client as the owner of property held by the state.

128.   Were Defendant to cease enforcing the license requirement to prohibit Plaintiffs from doing any or all of the following activities, Plaintiffs would not decline to do the activities which Defendant ceased prohibiting and would immediately resume offering to do the same in Illinois, even if Defendant still prohibited Plaintiffs from doing other of these activities:

a.  Reading public documents when the content of those documents concerns a client's or potential client's unclaimed property;

b.  Analyzing public documents when the content of those documents concerns a client's or potential client's unclaimed property;

c.  Communicating with the client, potential client, or others when the content of those communications concerns a client's or potential client's unclaimed property;

d.  Providing advice to a client, potential client, or others when the content of that advice concerns a client or potential client's unclaimed property.

e. Compiling information and documents when the content of that information or those documents concerns a client's or potential client's unclaimed property;

f. Communicating with the Treasurer when the content of those communications identifies a client as the owner of property held by the state; or

g. Communicating with the Treasurer when the content of those communications concerns requests from the Treasurer for additional information identifying a client as the owner of property held by the state.

## CAUSES OF ACTION

### Count I
### First Amendment (Freedom of Speech)

129. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1–128 as if fully stated here.

130. Plaintiffs have a right to engage in speech under the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment.

131. Plaintiffs want to read, analyze, communicate, provide advice on, and compile information and documents concerning their clients' and potential clients' unclaimed property held by the Treasurer.

132. Reading, analyzing, communicating, providing advice, and compiling information and documents concerning their clients' or potential clients' unclaimed property are speech within the meaning of the First Amendment, fall outside any

29

recognized exception to the First Amendment, and are fully protected by the First Amendment.

133.   The First Amendment fully protects Plaintiffs' right to read, analyze, communicate, provide advice on, and compile information and documents concerning their clients' or potential clients' unclaimed property regardless of Plaintiffs' charging a fee for that speech.

134.   765 ILCS 1026/15-1302(e), 765 ILCS 1026/15-1303, and 74 Ill. Admin. Code 760.651(a)(1) (together, the "license requirement") prohibit Plaintiffs from reading, analyzing, communicating, providing advice, or compiling information and documents concerning their clients' or potential clients' unclaimed property in exchange for a fee. That is a content-based restriction on speech; the law applies to Plaintiffs only because of the type of information and documents—the communicative content—that they want to read, analyze, communicate, provide advice on, and compile.

135.   The operation and enforcement of the license requirement mean that Plaintiffs cannot read, analyze, provide advice on, or communicate information and documents concerning their clients' or potential clients' unclaimed property to anyone, including the clients or potential clients who own the property. In other words, Illinois's license requirement prohibits Plaintiffs from telling property owners that Illinois is holding their property in exchange for a fee.

136.   Content based laws like Defendant's licensing scheme "are presumptively unconstitutional and may be justified only if the government proves that they satisfy strict scrutiny." *Richwine v. Matuszak*, 148 F.4th 942, 952 (7th Cir. 2025) (cleaned up).

137. To survive strict scrutiny, a content-based restriction must "further[] a compelling interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (internal quotation marks omitted).

138. Defendant lacks even a substantial interest—much less a compelling one—in preventing Plaintiffs from reading, analyzing, communicating, providing advice on, and compiling information and documents concerning their clients' or potential clients' unclaimed property in exchange for a fee. Illinois has also no interest in keeping property owners ignorant of the fact that the Treasurer possesses their unclaimed property. Illinois likewise has no interest in keeping the Treasurer ignorant of information and evidence that would result in the Treasurer returning unclaimed property to its rightful owner.

139. To survive strict scrutiny, a content-based restriction must be narrowly tailored to achieve the government's compelling interest. *Id.*

140. Regardless of any interest Defendant may have in regulating Plaintiffs' business, requiring a finder license is not narrowly tailored or even substantially tailored to that interest. *See Richwine*, 148 F.4th at 954–57.

141. The good moral character requirement to get a finder license has nothing to do with Plaintiffs' business helping clients find and recover unclaimed property.

142. Requiring a private detective license to read, analyze, communicate, provide advice on, and compile information and documents concerning unclaimed property in exchange for a fee violates the First Amendment.

143. Preventing Plaintiffs from reading, analyzing, communicating, providing advice, and compiling information and documents concerning their clients' or potential clients' unclaimed property in exchange for a fee based on a past violation of an unconstitutional law is itself unconstitutional.

31

144. Preventing Plaintiffs from reading, analyzing, communicating, providing advice, and compiling information and documents concerning their clients' or potential clients' unclaimed property in exchange for a fee based on their past exercise of their constitutional rights is itself unconstitutional.

145. Exempting attorneys and CPAs from the licensing requirement has nothing to do with any compelling state interest.

146. In the alternative, a government restriction that "incidentally burden[s] speech" is constitutional only if it withstands intermediate scrutiny. *See Richwine*, 148 F.4th at 953–54 (citation omitted).

147. Defendant's licensing scheme survives intermediate scrutiny if it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Id*. at 954.

148. Defendant lacks an important interest in preventing Plaintiffs from reading, analyzing, communicating, providing advice, and compiling information and documents concerning their clients' or potential clients' unclaimed property in exchange for a fee.

149. For the same reasons stated above, Defendant's licensing scheme burdens substantially more speech than necessary to further the government's interests.

150. Under Illinois's current licensing requirement, as interpreted and enforced by Defendant, only licensed finders (or attorneys or CPAs) may engage in reading, analyzing, communicating, providing advice on, or compiling information and documents concerning clients' or potential clients' unclaimed property in exchange for a fee.

151. On their face and as applied to Plaintiffs, the license requirement restrains Plaintiffs' ability to read, analyze, communicate, provide advice on, and compile

information and documents concerning their clients' or potential clients' unclaimed property.

152. Application of the license requirement acts as a content- and speaker-based restriction on the availability and use of information.

153. Defendant's enforcement of Illinois's license requirement to suppress Plaintiffs' speech rights cannot withstand any level of First Amendment scrutiny. *See Richwine*, 148 F.4th at 954–57.

154. To the extent that Illinois's license requirement limits citizens' ability to access information about their property, the licensing requirement is subject to increased First Amendment scrutiny. *See id.* at 955 ("[T]o the extent that [Illinois] wants to prevent its citizens' access to this information about their options, that is the very type of overregulation that the First Amendment requires us to view with heavy skepticism.").

155. Unless 765 ILCS 1026/15-1302(e), 765 ILCS 1026/15-1303, and 74 Ill. Admin. Code 760.651(a)(1) are declared unconstitutional and Defendant enjoined from enforcing them against Plaintiffs, Plaintiffs will suffer continuing and irreparable harm.

**Count II**
**First Amendment (Right to Petition)**

156. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1–128 as if fully stated here.

157. Plaintiffs have the right to petition the government under the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment.

158. Plaintiffs want to communicate truthful documents and information to the Treasurer identifying Plaintiffs' clients as the owners of unclaimed property held by the

Treasurer so that the Treasurer may fulfill his statutory obligation to return the property to the property owner under 765 ILCS 1026/15-904.

159.   Communicating truthful documents and information to the Treasurer identifying Plaintiffs' clients as the owners of unclaimed property to allow the Treasurer to return that property in fulfillment of his statutory duties is petitioning the government within the meaning of the First Amendment, falls outside any recognized exception to the First Amendment, and is fully protected by the First Amendment.

160.   The First Amendment fully protects Plaintiffs' right to communicate truthful documents and information to the Treasurer identifying Plaintiffs' clients as the owners of unclaimed property regardless of Plaintiffs' charging a fee for making that petition.

161.   By telling Plaintiffs not to communicate truthful documents and information to the Treasurer identifying Plaintiffs' clients as the owners of unclaimed property without obtaining a finder license, Defendant is engaged in the restriction of Plaintiffs' right to petition.

162.   The operation and enforcement of 765 ILCS 1026/15-1302(e), 765 ILCS 1026/15-1303, and 74 Ill. Admin. Code 760.651(a)(1) (together, the "license requirement") mean that Plaintiffs cannot communicate information and documents to the Treasurer identifying Plaintiffs' clients as the owners of unclaimed property in exchange for fees from Plaintiffs' clients even though that information and those documents would assist the Treasurer in returning the property it is holding in trust for Plaintiffs' clients. In other words, the license requirement prohibits Plaintiffs from telling the Treasurer whose property the Treasurer is holding or assisting the Treasurer in

34

fulfilling his statutory obligation to return the property to its rightful owner in exchange for a fee.

163. Defendant lacks even a substantial interest—much less a compelling one—in preventing Plaintiffs from communicating truthful documents and information to the Treasurer identifying Plaintiffs' clients as the owners of unclaimed property. Illinois has no interest in keeping the Treasurer ignorant of information and evidence that would result in the Treasurer returning unclaimed property to its rightful owner.

164. Regardless of any interest Defendant may have in regulating Plaintiffs' business, requiring a finder license is not narrowly tailored or even substantially tailored to that interest.

165. The good moral character requirement to get a finder license has nothing to do with Plaintiffs' business helping clients find and recover unclaimed property.

166. Requiring a private detective license to read, analyze, communicate, provide advice on, and compile information and documents concerning unclaimed property in exchange for a fee violates the First Amendment.

167. Preventing Plaintiffs from reading, analyzing, communicating, providing advice, and compiling information and documents concerning their clients' or potential clients' unclaimed property in exchange for a fee based on a past violation of an unconstitutional law is itself unconstitutional.

168. Preventing Plaintiffs from reading, analyzing, communicating, providing advice, and compiling information and documents concerning their clients' or potential clients' unclaimed property in exchange for a fee based on their past exercise of their constitutional rights is itself unconstitutional.

169. Exempting attorneys and CPAs from the licensing requirement has nothing to do with any compelling state interest.

170. On their face and as applied to Plaintiffs, the license requirement restrains Plaintiffs' ability to communicate truthful documents and information to the Treasurer identifying Plaintiffs' clients as the owners of unclaimed property.

171. Defendant's enforcement of the license requirement to suppress Plaintiffs' petition rights cannot withstand any level of First Amendment scrutiny.

172. Unless 765 ILCS 1026/15-1302(e), 765 ILCS 1026/15-1303, and 74 Ill. Admin. Code 760.651(a)(1) are declared unconstitutional and Defendant enjoined from enforcing them against Plaintiffs, Plaintiffs will suffer continuing and irreparable harm.

## Count III
## Fourteenth Amendment (Due Process)

173. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1–128 as if fully stated here.

174. Defendant may not deprive Plaintiffs of "life, liberty, or property, without due process of law" under the Fourteenth Amendment to the United States Constitution.

175. The Fourteenth Amendment's Due Process Clause protects the right to earn a living in the occupation of a person's choice subject to rational government regulation.

176. Plaintiffs want to help willing clients by reading documents, analyzing documents, communicating, providing advice, compiling documents, and submitting claims concerning their clients' unclaimed property held by the Treasurer in exchange for a fee.

177. By barring Plaintiffs from reading documents, analyzing documents, communicating, providing advice, compiling documents, and submitting claims in

exchange for a fee, Defendant has prevented Plaintiffs from pursuing the occupation of their choosing.

178. The good moral character requirement to get a finder license has nothing to do with Plaintiffs' business helping clients find and recover unclaimed property.

179. Requiring a private detective license to read, analyze, communicate, provide advice on, and compile information and documents concerning unclaimed property in exchange for a fee violates the First Amendment.

180. Preventing Plaintiffs from reading, analyzing, communicating, providing advice, and compiling information and documents concerning their clients' or potential clients' unclaimed property in exchange for a fee based on a past violation of an unconstitutional law is itself unconstitutional.

181. Preventing Plaintiffs from reading, analyzing, communicating, providing advice, and compiling information and documents concerning their clients' or potential clients' unclaimed property in exchange for a fee based on their past exercise of their constitutional rights is itself unconstitutional.

182. Exempting attorneys and CPAs from the licensing requirement has nothing to do with any compelling state interest.

183. Exempting CPAs and attorneys from the licensing requirement bears no rational relation to any legitimate government interest.

184. Requiring Plaintiffs to obtain a finder license would not protect the public.

185. Requiring Plaintiffs to obtain a finder license is not rationally related to any legitimate government interest.

186. Defendant's licensing requirement is subject to increased scrutiny because the state has a profit incentive to retain as much unclaimed property as possible to divert to other budgetary shortfalls. *See, e.g.*, 765 ILCS 1026/15-801.

187. The license requirement cannot survive any level of constitutional scrutiny.

188. Unless 765 ILCS 1026/15-1302(e), 765 ILCS 1026/15-1303, and 74 Ill. Admin. Code 760.651(a)(1) are declared unconstitutional and Defendant enjoined from enforcing them against Plaintiffs, Plaintiffs will suffer continuing and irreparable harm.

### Count IV
### Fourteenth Amendment (Privileges or Immunities)

189. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1–128 as if fully stated here.

190. Defendant may not "abridge the privileges or immunities" of Plaintiffs under the Fourteenth Amendment to the United States Constitution.

191. By barring Plaintiffs from finding and recovering unclaimed property without a finder license, Defendant is violating the Privileges or Immunities Clause.

192. Unless 765 ILCS 1026/15-1302(e), 765 ILCS 1026/15-1303, and 74 Ill. Admin. Code 760.651(a)(1) are declared unconstitutional and Defendant enjoined from enforcing them against Plaintiffs, Plaintiffs will suffer continuing and irreparable harm.

193. Plaintiffs recognize that this claim is foreclosed by *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873). They preserve it here given the "overwhelming consensus among leading constitutional scholars" that *Slaughter-House* was "egregiously wrong." *McDonald v. Chicago*, 561 U.S. 742, 756–57 (2010) (noting argument made in brief of Constitutional Law Professors as Amici Curiae, No. 08-1521, 561 U.S. 742 (filed July 9, 2009)).

**PRAYER FOR RELIEF**

As remedies for the constitutional violations described above, Plaintiffs respectfully request the following relief:

A.    A declaration that Defendant's enforcement of 765 ILCS 1026/15-1302(e), 765 ILCS 1026/15-1303, and 74 Ill. Admin. Code 760.651(a)(1) violate the First and Fourteenth Amendments on their face and as applied to Plaintiffs;

B.    A preliminary injunction enjoining enforcement of 765 ILCS 1026/15-1302(e), 765 ILCS 1026/15-1303, and 74 Ill. Admin. Code 760.651(a)(1) on their face and as applied to Plaintiffs.

C.    A permanent injunction enjoining enforcement of 765 ILCS 1026/15-1302(e), 765 ILCS 1026/15-1303, and 74 Ill. Admin. Code 760.651(a)(1) on their face and as applied to Plaintiffs.

D.    Attorney's fees and costs under 42 U.S.C. § 1988 and any other applicable statute; and

E.    Any other relief the Court deems just and proper.

Dated: January 23, 2026

s/James T. Knight II
James T. Knight II
DC Bar No. 1671382
Sophia Henderson
VA Bar No. 99385
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, VA 22203
(703) 682-9320
jknight@ij.org
shenderson@ij.org

Jeffrey Rowes
TX Bar No. 24104956
INSTITUTE FOR JUSTICE
816 Congress Ave., Ste. 970
Austin, TX 78701-2475
(512) 480-5936
jrowes@ij.org

*Counsel for Plaintiffs*