E-FILED
Wednesday, 30 September, 2026 12:15:23 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| **DAVID KNOTT and UNITED ASSET RECOVERY, INC.,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 24-cv-3067** |
| | ) | |
| **MICHAEL W. FRERICHS, in his official capacity as Illinois State Treasurer,** | ) | |
| **Defendant.** | ) | |

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court is Plaintiff's Motion for a Preliminary Injunction (Doc. 35). For the following reasons, the Motion is DENIED.

## I. FACTUAL BACKGROUND

The Illinois State Treasurer holds in trust over five billion dollars in unclaimed property, which is made up of uncashed checks, abandoned accounts, and other financial assets. (Doc. 36 at ¶¶ 2, 17). Illinois provides a publicly accessible database of all the unclaimed property it holds at https://icash.illinoistreasurer.gov. (*Id.* at ¶ 37). Anyone can search the database to see if they have unclaimed property. (*Id.* at ¶ 40). To reclaim property, an owner may use the database to submit a "claim" to the Treasurer with supporting documentation establishing ownership of the asset. (*Id.* at ¶¶ 45, 49–50). Illinois law requires the Treasurer to "pay or deliver property" to its owner once he "receives evidence sufficient to establish" its ownership. (*Id.* at ¶¶ 2, 55, 58). 765 ILCS

1026/15-904. The Treasurer may ask for additional evidence, or he may deny the claim if ownership is not established. *Id.* § 15-904(c). If the claim is denied, the claimant may submit an amended claim, and the Treasurer must "consider [the] amended claim . . . as an initial claim," subject to the same standards. *Id.*

David Knott and his company, United Asset Recovery, Inc., are in the business of unclaimed asset finding. (Doc. 36 at ¶ 3). Plaintiffs operate in many states, including Illinois. (*Id.* at ¶ 32). Plaintiffs search the Treasurer's database for unclaimed property owned by past, current, or potential clients. (*Id.* at ¶ 38). After selecting an owner of unclaimed property from the database, Plaintiffs inform the owner about their unclaimed property, how they may reclaim it, and how Plaintiffs can help. (*Id.*). After entering into an agreement, Plaintiffs communicate with their clients and aid in the following: 1) search for more unclaimed property, 2) help them submit claims for their property, 3) assemble the supporting documentation, and 4) respond to any requests for additional information from the Treasurer. (*Id.* at ¶¶ 43–54, 56, 61). Clients pay United Asset Recovery only after receiving their property, which is typically a contingent commission of 10 percent of the value of the asset(s) recovered. (*Id.* at ¶ 60).

Prior to 2026, the Illinois Revised Uniform Unclaimed Property Act required asset finders to hold a state-issued private detective license. 765 ILCS 1026/15-1302(e) (eff. Jan. 1, 2018), *amended by* 765 ILCS 1026/15-1302(e) (eff. Jan. 1, 2026). On August 5, 2021, Plaintiffs received a letter from the Office of the Treasurer advising them that they were violating Illinois law by operating without a private detective license. (Doc. 36 at ¶¶ 65–

69). Specifically, the pre-2026 law prohibited Plaintiffs, unlicensed, from collecting a commission from clients for "discovering, on behalf of an apparent owner, presumptively abandoned property." 765 ICS 1026/15-1302(e) (eff. Jan. 1, 2018). (Doc. 36 at ¶ 70). The implementing regulation also required finders to attach a copy of their license to any claim submitted to the Treasurer. 74 Ill. Admin. Code 760.650(c)(2) (eff. Sept. 10, 2024).

Effective January 1, 2026, Illinois amended the Illinois Revised Uniform Unclaimed Property Act and adopted new implementing regulations. *See* 765 ILCS 1026/15-1302(e) (eff. Jan. 1, 2026); 765 ILCS 1026/15-1303 (eff. Jan. 1, 2026); 74 Ill. Admin. Code 760.001 (eff. Dec. 31, 2025) (collectively, the "Finder Statutes," the "Statutes," or the "licensing scheme"). The Finder Statutes now provide that any "person attempting or seeking to act as a finder must be licensed as a finder by the [Treasurer]." 765 ILCS 1026/15-1302(e). And "[n]o person shall, without a valid license issued by the [Treasurer], represent or present to the public in any manner to be a finder in the State of Illinois or act as a finder." 74 Ill. Admin. Code 760.651(a)(1). Absent a license, any finder's agreement is "void." 765 ILCS 1026/15-1302(a). Any person who violates any provision of the Finder Statutes may be assessed a civil penalty up to $10,000 for each violation. 765 ILCS 1026/15-1303(i)(4).

Under the Statutes, a "finder" includes "any person engaged in the location, recovery, purchase, or assignment of property held by the [Treasurer] for a fee, compensation, commission, or other renumeration paid by the owner of the property." 765 ILCS 1026/15-102(9.5). A "finder" also includes any "person engaged in *assisting* in

the location, recovery, purchase, or assignment of property held by the administrator for a fee, compensation, commission, or other renumeration paid by the owner of the property." *Id.* (emphasis added).

Among other requirements, every application for a finder license must be accompanied by payment of a nonrefundable fee as well as a fidelity bond "in an amount established by the [Treasurer] by rule not to exceed $100,000" running to the benefit of the Treasurer. 765 ILCS 1026/15-1303(c)–(d); 74 Ill. Admin. Code 760.651(c)(1), (7). Additionally, a license may only issue to those applicants the Treasurer determines to possess "good moral character." 765 ILCS 1026/15-1303(b)(2); 74 Ill. Admin. Code 760.651(b)(2). The Treasurer "shall take into consideration . . . [w]hether the applicant has intentionally violated any provision of this Act or a predecessor law or any regulations relating thereto." 765 ILCS 1026/15-1303(b)(2)(C); 74 Ill. Admin. Code 760.651(b)(2)(C). Plaintiffs have not done business in Illinois since receiving the Treasurer's letter in 2021 despite the new licensing scheme taking effect. (*Id.* at ¶ 113). Plaintiffs believe the Treasurer will deny their application under the new licensing scheme for lack of "good moral character" because of the letter they received back in 2021 regarding the claimed violation of the pre-2026 law. (Doc. 36 at ¶¶ 105–107).

Plaintiffs allege enforcement of the Finder Statutes have prevented them from doing the following in absence of a license:

a. Reading public documents when the content of those documents concerns a client's or potential client's unclaimed property;

b. Analyzing public documents when the content of those documents concerns a client's or potential client's unclaimed property;

c. Communicating with the client, potential client, or others when the content of those communications concerns a client's or potential client's unclaimed property;

d. Providing advice to a client, potential client, or others when the content of that advice concerns a client or potential client's unclaimed property;

e. Compiling information and documents when the content of that information or those documents concerns a client's or potential client's unclaimed property;

f. Communicating with the Treasurer when the content of those communications identifies a client as the owner of property held by the state; or

g. Communicating with the Treasurer when the content of those communications concerns a request from the Treasurer for additional information identifying a client as the owner of property held by the state.

(Doc. 36 at ¶ 119).

## II. PROCEDURAL BACKGROUND

On January 26, 2026, Plaintiffs filed a four-count Amended Complaint alleging violations of the First and Fourteenth Amendments against Defendant Michael W. Frerichs in his official capacity as the Illinois State Treasurer. Counts I and II, respectively, allege the Treasurer is infringing upon Plaintiffs' rights to free speech and to petition the Government. Count III alleges the Treasurer is depriving Plaintiffs of their right to due

process. And Count IV alleges the Treasurer is violating the Privileges or Immunities Clause.[1]

Plaintiffs moved for a preliminary injunction that, if granted, would enjoin the Treasurer from enforcing 765 ILCS 1026/15-1302(e), 765 ILCS 1026/15-1303, 74 Illinois Administrative Code 760.651(a)(1), "or any other law or regulation related to asset finder licensing against Plaintiffs for the pendency of this case." (Doc. 35).

At oral argument, counsel for the Treasurer relied on arguments that were not in his opposition brief. The Court concluded the hearing by allowing the Treasurer an opportunity to submit a ten-page supplemental response from which Plaintiffs would be able to submit a reply. The motion is now ripe for decision.

## III. DISCUSSION

### A. Legal Standard

To obtain preliminary injunctive relief, a plaintiff must show 1) "he is likely to succeed on the merits," 2) "he is likely to suffer irreparable harm in the absence of preliminary relief," 3) "the balance of equities tips in his favor," and 4) "an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see also Richwine v. Matuszak*, 148 F.4th 942, 952 (7th Cir. 2025). "[A]n applicant for preliminary relief bears a significant burden, even though the Court recognizes that, at such a preliminary stage, the applicant need not show that it definitely will win the case." *Richwine*, 148 F.4th at 952 (quotation omitted).

[1] Plaintiffs state they "recognize that this claim is foreclosed by *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873)." (Doc. 36 at ¶ 193).

**B. Success on the Merits**

Plaintiffs bring a First Amendment as-applied[2] challenge to the Finder Statutes. This Court's review of the Statutes, as applied to Plaintiffs, is limited to "the facts and circumstances of this case" and not "whether another scenario would warrant a different outcome" under the statutory scheme. *Richwine*, 148 F.4th at 955 (citation omitted). The parties dispute the appropriate standard of review.

**1. Standard of Review**

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I). "Generally, speakers need not obtain a license to speak." *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 802 (1988). Although "that rule is not absolute," *id.*, when the State imposes a prior restraint on speech, courts are skeptical, *see, e.g.*, *Watchtower Bible & Tract. Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165–66 (2002) ("It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so."); *Riley*, 487 U.S. at 801 ("[T]he State's asserted power to license professional fundraisers carries with it (unless properly constrained) the power directly and substantially to affect the speech they utter. Consequently, the statute is subject to First Amendment scrutiny.").

[2] Although the Complaint challenges the Finder Statutes both facially and as-applied, (Doc. 36 at ¶¶ 8, 151, 170), Plaintiffs move only to enjoin enforcement against them for the pendency of this case.

The appropriate level of First Amendment scrutiny to apply to a law regulating speech depends on whether its regulation is content-based or content-neutral. *Reed*, 576 U.S. at 163. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests," *id.*, a standard referred to as "strict scrutiny," *id.* at 171. A law "is content based if [it] applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163.

"But the mere 'examination of speech or expression' does not automatically trigger First Amendment concern warranting strict scrutiny." *Richwine*, 148 F.4th at 953 (quoting *City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 596 U.S. 61, 73–74 (2022)). If "a statute primarily regulates conduct and only 'incidentally burden[s] speech,' then it need not survive strict scrutiny." *Id.* (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 769 (2018)). Yet "if 'the conduct triggering coverage under the statute consists of communicating a message,' then it is impermissibly content-based as applied." *Id.* (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28 (2010)).

If a law regulating speech is content-neutral, the law is reviewed with "intermediate scrutiny." *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 471 (2025). "Under that standard, a law will survive review 'if it advances important government interests unrelated to the suppression of free speech and does not burden substantially

more speech than necessary to further those interests.'" *Id.* (quoting *Turner Broad. Sys. v. F.C.C.*, 520 U.S. 180, 189 (1997) (hereinafter, "*Turner II*")).

Here, the Finder Statutes are content-neutral as they primarily regulate conduct and only incidentally burden speech. *See Richwine*, 148 F.4th at 953. The Statutes merely require anyone "attempting or seeking to act as a finder," thereby engaging in or assisting in "the location, recovery, purchase, or assignment of property held by the [Treasurer] for a fee, compensation, commission, or other remuneration paid by the owner of the property," to be licensed. 765 ILCS 1026/15-1302(e) (license requirement); *id.* § 15-102(9.5) (defining "Finder"). Plaintiffs' business relies on searching the Treasurer's public database, locating property, and then notifying past, current, and potential clients of their unclaimed property. After entering into an agreement with clients, Plaintiffs aid in the recovery of clients' unclaimed property and submit claims on behalf of their clients to the Treasurer. Although Plaintiffs are communicating during the process, the Statutes' regulation is directed at their conduct, the unlicensed practice of "unclaimed property" finding—which includes the "location" and "recovery" of said property for a fee—and not any particular message that is conveyed. *Cf. Holder*, 561 U.S. at 28 (citing *Cohen v. California*, 403 U.S. 15, 16 (1971); *Texas v. Johnson*, 491 U.S. 397, 403 (1989)). Accordingly, intermediate scrutiny applies.[3]

---

[3] Having concluded that Plaintiffs' speech has First Amendment protection, the Court need not determine whether Plaintiffs' petition rights are implicated. *See Wayte v. United States*, 470 U.S. 598, 610 n.11 (1985) (the First Amendment's speech and petition guarantees are generally subject to the same analysis). The reasoning discussed throughout this Opinion for denying preliminary relief would equally apply to Plaintiffs' petitioning to the Treasurer.

**2. As Applied to Plaintiffs**

Under intermediate scrutiny, "a law will survive review 'if it advances important government interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'" *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (quoting *Turner II*, 520 U.S. at 189). Intermediate scrutiny requires a "reasonably close fit between the law's means and its ends though perfect calibration is not required." *Richwine*, 148 F.4th at 954–55 (quotation omitted and cleaned up). "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency." *Id.* at 955 (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)).

The Treasurer contends the Finder Statutes advance the following interests: 1) preventing fraud; 2) ensuring property owners reclaim their property; and 3) preventing unreasonable finders' fees. The Treasurer's principal interest is the first: "Finder licensing assures that finders are who they say, are trustworthy and scrupulous, and are familiar with the requirements of the Statute. . . . This, in turn, combats fraudulent claims filed by bad actors, who could pose as anyone and/or disappear. A bond guards against the occurrence of fraud or mistake and in those events provides funds to draw upon to recoup erroneously induced disbursements." (Doc. 64 at 6–7).

The second interest is a corollary of the first. The Treasurer explains that "[i]f an unlicensed, unbonded individual acting as a finder, whether deliberately or through mistake, directs a check to an address not of the actual legal owner, . . . that property is

gone, harming the rightful owner." (*Id.* at 8). On the third interest, the Treasurer contends the licensing scheme prevents finders from charging unclaimed property owners with unreasonable fees.

The Treasurer's interests are of significant importance, and the Statutes' tailored advancement of them does not substantially burden more of Plaintiffs' speech than necessary. The Statutes' definition of a "finder" is tailored to specific *acts*—the location, recovery, purchase, or assignment of property—rather than speech. In doing said acts, Plaintiffs, under the scheme, would have normally been subjected to license registration, background checks, and a fidelity bond. Indeed, these protections ensure that Plaintiffs, as finders, "are who they say, are trustworthy and scrupulous, and are familiar with the requirements of the Statute," and provide for recourse and reimbursement if unclaimed property owners are harmed. (Doc. 64 at 4, 6). Without said license or protection, Plaintiffs may recover someone else's property who may then never have their property returned.

Furthermore, the extent to which Plaintiffs' speech rights are harmed is unclear on this record. Plaintiffs have not attempted to collect property in Illinois since 2021, and the only enforcement (if any) by the State is a 2021 letter—before the current scheme's enactment and implementation—advising that Plaintiffs were violating now-old Illinois law by operating without a private detective's license. Today, Plaintiffs have not applied for a finder's license. Plaintiffs merely speculate that if they tried to apply, they would be denied. Because Plaintiffs challenge the statute as applied to them, the Court may focus

only "on the facts and circumstances of this case." *Richwine*, 148 F.4th at 955. Thus, the speculative burden on Plaintiffs' speech is diminished as compared to the Statutes' tailored interests discussed above.

Plaintiffs heavily rely on a recent Seventh Circuit case, *Richwine v. Matuszak*, 148 F.4th 942 (7th Cir. 2025). Lauren Richwine was a "death doula" who, through her company and as a death doula, offered the dying and their loved ones emotional support and guidance. *Id.* at 946. Indiana required a license for the "practice of funeral services," which included "the counseling of individuals concerning methods and alternatives for the final disposition of human remains." *Id.* at 946, 954. Richwine brought suit after a cease-and-desist order was entered barring a number of speech activities she engaged in as an unlicensed death doula. *Id.* at 946–47. Indiana claimed the following activities were not permitted absent a license: "discussing options for the final disposition of human remains, including traditional burial, green burial, or cremation; helping survivors decide what should be included in the funeral program; supporting survivors while they pick products and services at the funeral home; and reviewing the funeral home's price list." *Id.* at 954. The Court found the licensing scheme, as applied to Richwine, was unlikely to survive intermediate scrutiny because the State could not connect the dots between the statute's means (restricting Richwine's speech) and its ends (protecting the public and environment from disease and fraud). *Id.* at 955–58.

In contrast, where the Indiana scheme in *Richwine* directly proscribed specific speech activities—discussing funeral options, providing verbal guidance, and consulting

with families—the Finder Statutes concern only an individual's actions. *Cf. id.* at 947. Further, Richwine was directed to cease and desist her speech activities, whereas Plaintiffs have not even applied for a license and have not attempted to practice in Illinois under the current statutory scheme. The Treasurer, in fact, maintains that Plaintiffs *can* speak to others about unclaimed property without needing a license. (Doc. 64 at 9; Doc. 42 at 19).

Moreover, the *Richwine* Court found significant that Richwine and her company "do not perform any services that funeral directors are licensed to direct such as body care, death certificate filing, transportation, or making arrangements and that their clients must hire a funeral director" for those services. 148 F.4th at 955 (internal quotation marks omitted). Those services are plainly different from simply "telling a client about his or her options for the final disposition of their loved one's remains." *Id.* But here, Plaintiffs *do* seek to perform those kinds of services that go beyond merely speaking and, thus, carry a substantially greater propensity for the occurrence of fraud or mistake. In essence, the instant Plaintiffs, who stand to financially benefit from the sale of their services, *see id.* at 956, act more like funeral directors than like death doulas, *see also id.* (contrasting the services of Consumer Reports Magazine with car dealership salespeople). Requiring a license for the practice of the services Plaintiffs wish to provide consumers is reasonable and well-connected to the governmental interests advanced by the Treasurer. For all these reasons, the Court finds Plaintiffs are not likely to succeed on the merits.

### C. Irreparable Harm, the Balance of Equities, and the Public Interest

"[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor" warranting a preliminary injunction. *Higher Soc'y of Ind. v. Tippecanoe Cnty.*, 858 F.3d 1113, 1116 (7th Cir. 2017); *see also Smiley v. Jenner*, 173 F.4th 865, 868 (7th Cir. 2026) (affirming denial of preliminary injunction because plaintiff failed to show likelihood of success on the merits). Although the existence of "irreparable harm" is presumed in First Amendment cases, *see Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 450–51 (7th Cir. 2022), the Court finds for the reasons discussed throughout this Opinion that the balance of equities and the public interest favor the enforcement of the likely constitutional, generally applicable licensing scheme tailored to prevent fraud and otherwise protect the public. Plaintiffs have not carried their heavy burden by making a clear showing that the "extraordinary and drastic remedy" of a preliminary injunction is warranted. *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005); *Smiley*, 173 F.4th at 870.

## IV. CONCLUSION

Based on the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction (Doc. 35) is DENIED.

ENTER: September 30, 2026

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE